## LINDSAY & COMPANY, LIMITED, RESPONDENT, *v.* MONTANA FEDERATION OF LABOR ET AL., APPELLANTS.

(No. 2,531.)

(Submitted May 27, 1908. Decided June 1, 1908.)

[96 Pac. 127.]

*Labor Unions — Boycott — Definition — Injunction—"Unfair" Circulars—Right to Publish—Constitution.*

Labor Unions—Boycott—Definition.

1. The term "boycott" does not necessarily signify that those engaged in it employ violence, intimidation or other unlawful coercive means; but it may be correctly used in the sense of the act of a combination in refusing to have business dealings with another until he removes or ameliorates conditions which are deemed inimical to the welfare of the members of the combination or some of them, or grants concessions which are deemed to make for that purpose.

Same—Combinations—Conspiracy.

2. If an act done by one person is lawful, a combination of several persons to commit the same act does not make it unlawful, so as to render the members of the combination liable to a charge of conspiracy.

Same—Boycott—Injunction.

3. *Held*, that a labor organization may employ the boycott, as defined in paragraph 1 above, provided the means employed be not unlawful, in furtherance of the objects of its existence, even though financial loss results to the boycotted; and that injunction will not lie to enjoin its continuing in force.

Injury—Definition.

4. Injury, in its legal significance, means damage resulting from the violation of a legal right, and it is only the violation of such a right which renders an act wrongful in the eye of the law and makes it actionable.

Labor Unions—Boycott—"Unfair" Circular—Right to Publish—Constitution.

5. Under section 10, Article III of the Constitution, guaranteeing to every person the right to speak, write or publish whatever he will on any subject, being answerable, however, for a violation of the privilege, a court may not enjoin a labor organization from publishing a circular calling upon all laboring men, and those in sympathy with organized labor, not to patronize a certain business house, characterized therein as "unfair," even though the persons comprising the organization be insolvent, and an abuse of the liberty guaranteed by the Constitution may result in loss for which there cannot be any adequate compensation.

*Appeal from District Court, Yellowstone County; Sydney Fox, Judge.*

ACTION by Lindsay & Co., Limited, against the Montana Federation of Labor and others. From an order denying a motion to dissolve an injunction, defendants appeal. Reversed and remanded.

*Messrs. Walsh & Nolan,* and *Mr. Harry A. Groves,* for Appellants.

We cite the following cases to sustain our contention that the injunction herein should be dissolved: *Ulery* v. *Chicago Livestock Exchange,* 54 Ill. App. 233; *Bohn Mfg. Co.* v. *Hollis,* 54 Minn. 223, 40 Am. St. Rep. 319, 55 N. W. 1119, 21 L. R. A. 337; *Clemmitt* v. *Watson,* 14 Ind. App. 38, 42 N. E. 367; *National Protective Assn.* v. *Cumming,* 170 N. Y. 315, 88 Am. St. Rep. 848, 63 N. E. 369, 58 L. R. A. 135; *State* v. *Van Pelt,* 136 N. C. 633, 49 S. E. 177, 68 L. R. A. 760; *Wabash R. R. Co.* v. *Hannahan,* 121 Fed. 563; *Sinsheimer* v. *United Garment Workers,* 77 Hun, 215, 28 N. Y. Supp. 321; *Cohen* v. *United Garment Workers,* 35 Misc. Rep. 748, 72 N. Y. Supp. 341; *Mayer* v. *Journeymen Stonecutters' Assn.,* 47 N. J. Eq. 519, 20 Atl. 492; *Gray* v. *Building Trades Council,* 91 Minn. 171, 103 Am. St. Rep. 477, 97 N. W. 663, 63 L. R. A. 753; *Beck* v. *Railway etc. Union,* 118 Mich. 497, 74 Am. St. Rep. 421, 77 N. W. 13, 42 L. R. A. 407. The injunction is violative of section 10, Article III, of the Constitution of this state. (*Marx & Haas Jeans Clothing Co.* v. *Watson,* 168 Mo. 133, 90 Am. St. Rep. 440, 67 S. W. 391, 56 L. R. A. 951; *Dailey* v. *Superior Court,* 112 Cal. 94, 53 Am. St. Rep. 160, 44 Pac. 458, 32 L. R. A. 293.)

*Mr. O. F. Goddard,* for Respondent.

We contend that the action and conduct of the defendants under the authorities constitutes what is defined as a boycott, as defined in 5 Cyc. 995, and, if so, there can be no question as to the right of the plaintiff to an injunction against the defendants. We concede that labor organizations may lawfully induce, by peaceful means, those engaged in the same occupation

to become members of their organizations, and to refuse to allow their members to work in places where non-union laborers are employed. We go further, and concede that they have the right singly, or as a whole, to withdraw their patronage from any person, firm or corporation for good cause; but we maintain that when such organizations or combinations maliciously and wantonly, and by intimidation in whatever form, or by coercion of whatever degree or species, induce or compel others to withdraw their patronage, and thus break up and destroy the legitimate business of a law-abiding citizen, then they should be restrained from such unlawful interference. (*Hopkins* v. *Oxley Stave Co.*, 83 Fed. 912, 28 C. C. A. 99; *Moores* v. *Bricklayers' Union No. 1*, 23 Ohio L. J. 48; *Ertz* v. *Produce Exchange*, 79 Minn. 140, 79 Am. St. Rep. 433, 81 N. W. 737, 48 L. R. A. 90; *Gray* v. *Building Trades Council*, 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753; *Barr* v. *Essex Trades Council*, 53 N. J. Eq. 101, 30 Atl. 881.) Intimidation, within the meaning of the law, is not necessarily limited to threats of violence to person or property. A combination between persons merely to regulate their own conduct and affairs is allowable, and a lawful combination, though others may be indirectly affected thereby; but a combination to do injurious acts, expressly directed to another by way of intimidation or constraint, either by himself or of persons employed, or seeking to be employed, by him, is outside of allowable competition and unlawful. (*Vegelahn* v. *Guntner*, 167 Mass. 97, 57 Am. St. Rep. 443, 44 N. E. 1077, 35 L. R. A. 722; *Jersey City Printing Co.* v. *Cassidy*, 63 N. J. Eq. 759, 53 Atl. 230; see, also, *Beck* v. *Railway Teamsters' Protective Union*, 118 Mich. 497, 74 Am. St. Rep. 421, 77 N. W. 13, 42 L. R. A. 407; *Sailors' Union of the Pacific et al.* v. *Hammond Lumber Co.*, 156 Fed. 450; *Shine* v. *Fox Bros. Mfg. Co.*, 156 Fed. 357; *Rocky Mt. Bell Tel. Co.* v. *Montana Federation of Labor*, 156 Fed. 809; *Casey* v. *Cincinnati Typographical Union*, 45 Fed. 135, 12 L. R. A. 193; *Seattle Brewing & Malting Co.* v. *Hansen*, 144 Fed. 1011; *Allis-Chalmers Co.* v. *Iron Moulders Union No. 125*, 150 Fed. 173.)

The tendency of modern decision is toward declaring illegal and actionable any act committed solely out of bad motive, or what has been aptly termed "unmixed malice" without justifiable cause, and which materially injures, or is reasonably likely materially to injure, the person or feelings, or the business or occupation—in other words, the property rights—of another; and, as held in *State ex rel. Durner* v. *Huegin*, 110 Wis. 189, 85 N. W. 1046, 62 L. R. A. 700, approved and followed in *Hawarden* v. *Youghiogheny & L. Coal Co.*, 111 Wis. 545, 87 N. W. 472, 55 L. R. A. 828, in *Boutwell* v. *Marr*, 71 Vt. 1, 76 Am. St. Rep. 746, 42 Atl. 607, 43 L. R. A. 803, *Carew* v. *Rutherford*, 106 Mass. 1, 8 Am. Rep. 287, and *Delz* v. *Winfree*, 80 Tex. 400, 16 S. W. 111, such malicious act, committed under circumstances which would not be actionable if done by an individual, may become so if done by a combination or conspiracy of several.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This action was commenced by Lindsay & Co., Limited, a domestic corporation, having its principal office or place of business at Helena, with branch offices and places of business at Billings and Great Falls, in this state, and engaged in conducting the business of wholesale fruit and produce merchants at those places, against the Montana Federation of Labor, the Yellowstone Trades and Labor Assembly, Billings Clerks' Protective Union, certain officers of these associations, and others to secure an injunction restraining the defendants from certain acts alleged to have been committed by them and threatened to be continued. Upon the verified complaint a temporary injunction was issued. The defendants above named appeared by answer, which denies the allegations of the complaint material to this controversy, and upon such answer and oral testimony to be offered moved the court to dissolve the injunction. After a hearing the injunction was dissolved as to defendants Joy and Doody, and modified by striking out a portion of one sentence, and, with the modifications thus made, the motion was denied,

and the injunction continued in force against the remaining answering defendants. As modified, the injunction is as follows:

"You are hereby restrained and enjoined, until the further order of this court, or the judge thereof, from in any manner, directly or indirectly, interfering with or obstructing the business of plaintiff in the city of Billings and the town of Bear Creek, or in any manner interfering with any of the patrons of the plaintiff from trading or dealing with the plaintiff, or by threats, abuse, intimidation, or other means calculated or intended to interfere with the said business of the plaintiff; from declaring the plaintiff unfair, or from boycotting the plaintiff or from printing, publishing, circulating, posting, or distributing any circulars, posters, handbills, or other written or printed matter containing opprobrious or injurious epithets against said plaintiff or its business; from interfering with, intimidating, boycotting, molesting, or threatening in any manner the patrons or customers of the plaintiff, or any other person or persons, with the purpose of inducing them not to deal with or do business with the plaintiff, and from giving any directions or orders to committees, associations, unions, or any of their officers or members, or otherwise, for the performance of any act in this complaint mentioned, or in any manner obstructing or interfering with the regular operations and the conduct of the business of the plaintiff, and from in any way or manner threatening, intimidating or interfering with the plaintiff or any of its officers, agents, or employees in the conduct of the plaintiff's business, or in the discharge of the duties of any such officers, agents, or employees." From the order refusing to dissolve the injunction this appeal was taken.

For the purpose of this decision the allegations of the complaint need not be referred to at length. We are not called upon to determine the propriety of issuing the injunction in the first instance. The question for our decision is: Should the injunction have been continued in force after the hearing on the motion to dissolve was had? And the answer to this must depend upon the facts disclosed at such hearing. Stripped of all useless

verbiage, these facts appeared: That some time prior to October, 1907, Lindsay & Co. had been declared unfair by the Miners' Union and Trades Assembly in Helena, and this action had been indorsed by the Montana Federation of Labor, and circulars announcing the fact had been sent to labor organizations throughout the state. On October 25, 1907, the Yellowstone Trades and Labor Assembly, upon information received of the action taken in Helena, passed a resolution which declared Lindsay & Co. unfair, and referred the matter to the grievance committee of that organization to advise the public of the action taken. Acting upon the authority thus given, the grievance committee caused to be published and circulated among the business houses and elsewhere in Billings circulars, of which the following is a copy:

### "UNFAIR.

"All laboring men and those in sympathy with organized labor are requested not to patronize Lindsay & Co., who are engaged in the wholesale fruit business, also distributers for cigars and vegetables of all kinds in Billings and vicinity, as they are unfair. We urge the retail merchants, laboring men, and all who are in sympathy with organized labor to place themselves in position to patronize friendly wholesalers. We further desire to call attention to the fact that Lindsay & Co. are operating peddling wagons throughout this city, and we ask the people to guard against patronizing these wagons. We ask this for your own protection and the protection of organized labor.

"[Signed]  YELLOWSTONE TRADES AND LABOR ASSEMBLY."

That immediately after the adoption of the resolution and the publication of this circular a large number of retail dealers in Billings, who had theretofore purchased goods from the plaintiff company, ceased to do business with the concern, with the result that the business of the company at Billings was practically paralyzed, and great financial loss resulted. As stated by the witness Vaughan for plaintiff: "We have lost patronage

from these merchants on account of being unfair. A circular printed and sent around. There is no other cause." Another witness for the plaintiff testified that at a meeting of the Clerks' Union in Billings early in November, 1907, the defendant Fairgrieve made the statement that "they had Lindsay & Co. on the unfair list, and they had him where they wanted him, and he believed it was a good thing to leave him there." Fairgrieve testified that he did not remember making any such statement. However, this is immaterial to a consideration of the matter before us. From these facts we are to determine the question: Should the injunction have been dissolved? It is to be observed that only two acts of any consequence are shown to have been committed by the defendants: (1) They declared Lindsay & Co. unfair, or, in the language of respondent, boycotted the company; and (2) they published the circular set forth above, that is, they caused it to be printed and circulated.

The injunction, as modified, is very sweeping in its terms, and in that form could not be justified by any possible state of facts; but assuming that it was continued for the purpose of preventing the continuance in force of the boycott, and for the purpose of preventing a repetition of the publication of the circular or a similar one—although there is not any evidence of any threat or purpose on the part of the defendants or any of them to repeat that act—we may consider the question presented to us by reference to these two principal acts mentioned.

1. Does the continuance in force of the resolution of October 25, 1907, amount to such an invasion of plaintiff's rights as will warrant the interposition of a court of equity by injunction? To determine this question requires a brief reference to the policy pursued by courts and legislative bodies toward labor organizations, and the conflicts which have arisen between such organizations and the employers of labor.

If we accept the report in *Rex* v. *Journeymen Tailors*, 8 Mod. 11, as correct, it was held in that case that the preconcerted refusal of certain workingmen to continue their employment, even though their object was to secure an advance in wages, con-

stituted a criminal conspiracy, which was an indictable offense at common law, although the same act done by only one individual would not have been unlawful. But by Stats. 38 & 39, Vict., c. 86, the right of laboring men to organize for their mutual protection and benefit is directly recognized in Great Britain. Whatever may have been the attitude of the courts and legislative bodies in this country toward labor organizations in the past, it is sufficient for our purpose to know that the right of workingmen to organize for the improvement of their industrial condition is now generally admitted., The great diversity of opinions among the courts has arisen over a consideration of the question: What means may trade unions employ to further the objects of their organizations? It is well known that the means frequently employed are the strike and the boycott, and, as an incident of each, picketing, the use of placards and banners, and the publication of circulars.

It is insisted by the respondent company that the defendants organized a boycott of plaintiff's business by agreeing among themselves and with other members of organized labor to withhold their patronage from the plaintiff company, and that they undertook by coercion to compel the retail dealers of Billings and others to likewise withdraw their patronage; that the resolution of October 25, 1907, was intended and understood by the defendants to express the object of their preconcerted design; and that the publication of the circular was for the purpose of intimidating the retail dealers and others. We think it may fairly be said to have been shown by the evidence that upon the adoption of the resolution of October 25th, and upon the intelligence of that action becoming general among the union men there, it was understood among those men that they would not patronize Lindsay & Co. while the interdict was in force, and would not patronize anyone who did patronize that company, and that they expected that all retailers and others in sympathy with their organizations would cease trading with the plaintiff company.

Whether the acts done by the defendants constituted a boycott, of course depends entirely upon the definition of that term which may be adopted. The most casual observation will disclose that scarcely any two courts treating of the subject formulate the same definition. In fact, the growth and development of the country, the influence of science and invention on the mode of conducting business, and many other causes have combined to change materially the relation of employer and employee, and, as consequent upon it, the meaning of the terms employed at the time Captain Boycott was literally sent to Coventry by the tenants of Connemara. We are referred by respondent to three definitions of the term given in 5 Cyc. 995, as follows: "A combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless others do so, the many will cause similar loss to them; an organized effort to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs; a combination between persons to suspend or discontinue dealings or patronage with another person or persons because of the refusal to comply with a request of him or them." If we adopt any one of these, the evidence would fail to bring the acts of the defendants within the definition. But we prefer a broader definition, and one we deem more consonant with present-day conditions. We are of the opinion that the evidence shows that these defendants inaugurated a boycott on Lindsay & Co., and that it was still in effect at the date of the hearing. We adopt the language of the supreme court of New York in *Mills* v. *United States Printing Co.*, 99 App. Div. 605, 91 N. Y. Supp. 185, in which the court, speaking through Justice Jenks, said: "I think that the verb 'to boycott' does not necessarily signify that the doers employ violence, intimidation, or other unlawful coercive means; but that it may be correctly used in the sense of the act of a combination, in refusing to have busi-

ness dealings with another until he removes or ameliorates conditions which are deemed inimical to the welfare of the members of the combination, or some of them, or grants concessions which are deemed to make for that purpose.''

In *Ulery* v. *Chicago Live Stock Exchange,* 54 Ill. App. 233, it is said: ''A person, with or without reason, may refuse to trade with another; so may ten or fifty persons refuse. An individual may advise his neighbor or friend not to trade with another neighbor. He may even command when the command amounts only to earnest advice.''

But what is there unlawful in the act of the union workingmen of Billings in withdrawing their patronage from the plaintiff? Certainly it cannot be said that Lindsay & Co. had a property right in the trade of any particular person. In this country patronage depends upon goodwill, and we do not think that it will be contended by anyone that it was wrongful or unlawful, or violated any right of the plaintiff company, for any particular individual in Billings to withdraw his patronage from Lindsay & Co., or from any other concern which might be doing business with that company, and that, too, without regard to his reason for doing so. But there can be found running through our legal literature many remarkable statements that an act perfectly lawful when done by one person becomes by some sort of legerdemain criminal when done by two or more persons acting in concert, and this upon the theory that the concerted action amounts to a conspiracy. But with this doctrine we do not agree. If an individual is clothed with a right when acting alone, he does not lose such right merely by acting with others, each of whom is clothed with the same right. If the act done is lawful, the combination of several persons to commit it does not render it unlawful. In other words, the mere combination of action is not an element which gives character to the act. It is the illegality of the purpose to be accomplished, or the illegal means used in furtherance of the purpose, which makes the act illegal. (18 Ency. of Law, 2d ed., 82; *Bohn Mfg. Co.* v. *Hollis,* 54 Minn. 223, 40 Am. St. Rep. 319, 55 N. W. 119, 21 L.

R. A. 337.) ''A conspiracy is a combination of two or more persons by some concerted action to accomplish a criminal or unlawful purpose or to accomplish a purpose, not in itself criminal or unlawful, by criminal or unlawful means.'' (Anderson's Law Dictionary, 234, approved in *Spies* v. *People,* 122 Ill. p. 212, 3 Am. St. Rep. 320, 12 N. E. 865.) Speaking to this same subject, Mr. Justice Holmes, now of the United States supreme court, then a member of the supreme judicial court of Massachusetts, in *Vegelahn* v. *Guntner,* 167 Mass. 92, 57 Am. St. Rep. 443, 44 N. E. 1077, 35 L. R. A. 722, said: ''But there is a notion which latterly has been insisted on a good deal, that a combination of persons to do what any one of them lawfully might do by himself will make the otherwise lawful conduct unlawful. It would be rash to say that some as yet unformulated truth may not be hidden under this proposition. But in the general form in which it has been presented and accepted by many courts, I think it plainly untrue, both on authority and on principle.''

In *Macauley Bros.* v. *Tierney,* 19 R. I. 255, 61 Am. St. Rep. 770, 33 Atl. 1, 37 L. R. A. 455, the court said: ''To maintain a bill on the ground of conspiracy, it is necessary that it should appear that the object relied on as the basis of the conspiracy or the means used in accomplishing it were unlawful. What a person may lawfully do a number of persons may unite with him in doing without rendering themselves liable to the charge of conspiracy, provided the means employed be not unlawful.'' Upon the same subject the court of appeals of Indiana, in *Clemmitt* v. *Watson,* 14 Ind. App. 38, 42 N. E. 367, said: ''So far as appears by these instructions, none of the appellants were under any continuing contract to labor for their employer. Each one could have quit without incurring any civil liability to him. What each one could rightfully do, certainly all could do if they so desired, especially when their concerted action was taken peaceably, without any threats, violence or attempt at intimidation.'' Chief Justice Parker, in speaking for the court of appeals in *National Protective Assn.* v. *Cumming,* 170 N. Y.

315, 88 Am. St. Rep. 648, 63 N. E. 369, 58 L. R. A. 135, said: "Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act."

We hold, then, that a labor organization may employ the boycott as herein defined in furtherance of the objects of its existence. If, however, the means by which it enforces the boycott are illegal, then it may render its members amenable to the processes of the law; but, if they are not, the courts are powerless to render assistance to the person or firm boycotted, even though financial loss results as the direct consequence of the boycott. It may be true, that, speaking generally, no one has the right intentionally to do an act for the purpose of injuring another's business, but injury, however, in its legal significance, means damage resulting from the violation of a legal right and it is the violation of the legal right which renders an act wrongful in the eye of the law and makes it actionable. (*Macauley Bros.* v. *Tierney,* above.)

If then these defendants and their associates did not violate any legal right of the plaintiff in withdrawing their patronage from the company or in agreeing to withdraw their patronage from any one who might patronize Lindsay & Co., they cannot be enjoined from continuing the boycott in force so long as the means employed to make the boycott effective are not illegal. The evidence shows that the only means used in this instance was the publication of the circular in question, and this brings us to a consideration of the second proposition involved.

2. (a) May a court of equity enjoin the publication by an individual of a circular of this character? (b) If not may it enjoin such publication when made by a number of individuals acting collectively?

(a) Article III of our Constitution is entitled: "A Declaration of Rights of the People of the State of Montana," and section 10 of that Article, so far as applicable here, reads as follows: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever

he will on any subject, being responsible for all abuse of that liberty.'' The language here employed seems too clear to admit of doubt or argument. The one fundamental idea conveyed by this section, is penalty for a violation of the privilege, not prevention of its abuse. It cannot be said that a citizen of Montana is free to publish whatever he will on any subject. while an injunction preventing him from publishing a particular item upon a particular subject hangs over his head like a sword of Damocles, ready to fall with all the power which can be invoked in contempt proceedings, if he does the very thing the section of the Constitution says he may do. It is impossible to conceive the idea that the individual has an absolute right to publish what he pleases, subject to the restriction mentioned, and at the same time to entertain the idea that a court may prevent him from doing so. The two ideas cannot possibly co-exist. The language of the section is not susceptible of any other meaning than this: That the individual citizen of Montana cannot be prevented from speaking, writing, or publishing whatever he will on any subject. If, however, what he writes or publishes constitutes a criminal libel, he may be held responsible for the abuse of the liberty in a criminal prosecution (Penal Code, Title VIII, Chapter VIII), or, if what he speaks, writes, or publishes wrongfully infringes the rights of others he may be held responsible for the abuse in a civil action for damages. If this is not the meaning of the section it is because the framers employed language which is impotent as a vehicle for conveying their idea.

But it is suggested by counsel for respondent company that these defendants are insolvent, and that a judgment for damages would be worthless. Even granting this to be so, still the Constitution does not discriminate among men according to the amount of their possessions. The guaranty of this section extends as fully to the poorest as to the wealthiest citizen of the state; and, though an abuse of the liberty so guaranteed may result in loss for which there cannot be any adequate compensation, the framers of our Constitution in preparing it, and the

people in adopting it, doubtless concluded that it was better that such results be reached in isolated cases, than that the liberty of speech be subject to the supervision of a censor. To declare that a court may say that an individual shall not publish a particular item is to say that the court may determine in advance just what the citizen may or may not speak or write upon a given subject—is, in fact, to say that such court is a censor of speech as well as of the press. Under similar constitutional provisions, the supreme courts of California and Missouri have reached the same conclusion. (*Dailey* v. *Superior Court,* 112 Cal. 94, 53 Am. St. Rep. 160, 44 Pac. 458, 32 L. R. A. 273; *Marx & Haas Jeans Clothing Co.* v. *Watson,* 168 Mo. 133, 90 Am. St. Rep. 440, 67 S. W. 391, 56 L. R. A. 951.)

(b)    What we have said above, in the first paragraph of this opinion, is likewise applicable here. If any one of these individuals could publish this circular, they may with equal security all join in its publication.

We think the evidence produced at the hearing was insufficient to justify the continuance in force of the injunction, and it should have been dissolved.

The order of the court is reversed, and the cause is remanded, with direction to vacate the order heretofore made and enter an order dissolving the injunction.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SMITH concur.