Hoffheimer, J.
This cause was heard on motion of plaintiff for a temporary-restraining order, and by the prayer the court is asked to restrain defendants from doing the alleged illegal acts complained of in the body of the petition.
These alleged illegal acts referred to, may be stated to be:
(a) That defendants are engaged in a sympathetic strike in the nature of a boycott and should be enjoined.
(b) That the purpose of the strike is not only unlawful, but is being carried out by unlawful means, that is, by acts of intimidation and threats against plaintiff’s employes who did not strike, and in order to compel them to quit plaintiff’s service.
(c) Threats to injure Mr. Klotter.
(d) That defendants are boycotting plaintiff by the circulation of the circulars, Exhibits 1 and 2.
Charges (a), (5) and (c) may be considered together.
In support of plaintiff’s contention that the strike herein inaugurated is unlawful, both because of its purpose and the means resorted to effectuate it, I am cited to a number of cases by plaintiff, some of which will be found digested in 6 L. E. A. and 17 L. E. A.
Reynolds v. Davis, 198 Mass., 294, is the latest of the class of eases cited by plaintiff. This case (by a divided court, Knowlton, Ch. J., dissenting) it may be noted has been criticised as inconsistent and extreme. Martin on Labor Unions, Section 49; Note 17 L. R. A., 163.
The majority opinion, however, is based on cases such as Carew v. Rutherford, 166 Mass., 1; Plant v. Woods, 167 Mass., 492; Pickett v. Walsh, 192 Mass., 172, all of which cases are also cited by plaintiff.
Attention to these cases shows that the combination to strike or the strikes were illegal because effected or indulged in for other or more remote purposes than the settlement of any complaint on the part of the strikers themselves, as to wages or methods or surroundings in their particular employments, or did not have to do with any trade dispute or other matter that was the natural outgrowth or incident of the relation of employer and employed.
*259 In Moores v. Bricklayers’ Union, 23 W. L. B., 48, 53 (cited by plaintiff), Taft, J., in tbe course of the opinion, said, speaking of Carew v. Rutherford:
“We do not conceive that in this state or country a combination by workingmen to raise their wages or to obtain any mutual advantage is contrary -to law, provided they do not use such indirect means as obscure their original intent and make their combination one merely malicious to oppress and injure individuals. Such we understand to be the effect of Chief Justice Shaw’s opinion in Commonwealth v. Hunt, 4 Metc., 125, where it was held that a society of workingmen, one of whose rules bound the members not to serve any master who employed non-society workmen, was not illegal of itself until it appeared that the purpose was unlawful. Accordingly in Carew v. Rutherford, where a contracting stone-mason, contrary to the rules of his workman’s union, sent some of his material out of the state to be dressed, and his men refused to work for him any longer rmlflps he paid a fine to the society, and upon his refusal left him and only returned upon the payment of the fine, it was held that this combination being for the purpose of extortion and mischief, was illegal.”
Plant v. Woods, supra, arose out of a fight between two labor unions, and it will be found that defendant union endeavored to coerce members of plaintiff’s union into joining their organization by coercing employers into discharging such as refused, leading such employers to believe that if they did not do so they would suffer through strikes and boycotts.
Of Re Higgins, 27 Fed., 443, it is said, in the note to Pickett v. Walsh, supra (6 L. R. A., 1070), that the court declared itself satisfied, from the fact that the great majority of the strikers were not aware of any reason for the orders to strike, that the reason given therefor was a mere pretense, and that the real motive was to compel the recognition of a certain labor organization, so that its officers should be consulted in the operation and management of railroads in which they had no interest and of which they were not employes, an object which in the court’s opinion plainly made their acts illegal.
In Thomas v. Cincinnati, etc., Ry. Co., 62 Fed., 803 (cited by plaintiff), the court said:
*260 “The combination was unlawful. * * * The employes of the railway companies had no grievances against their employers. Handling and hauling Pullman cars did not render their services any more burdensome. They had no complaint against the use of Pullman ears as cars. They came into no natural relation with Pullman, in handling the cars. He paid them no wages. He did not regulate their hours,or in any way determine their services. Simply to injure him in his business they were incited and encouraged to compel the railway companies to withdraw custom from him by threats of quitting their service and actually quitting their service. This inflicted an injury * * * unlawful because it was without lawful excuse. All the employes had the right to quit their employment, but they had no right to combine to quit in order thereby to compel their employer to withdraw from a mutually profitable relation with a third' person for the purpose of injuring that third person, when the relation thus sought to be broken had no effect on the character or award of their services. * * * The purpose shortly stated was to starve the railway companies and the public into compelling Pullman to do something which they had no lawful right to compel him to do."
In Quinn v. Leathem, A. C., 495, the members of a labor union were made to respond to damages for the injury, done to the plaintiff, a butcher, by compelling one of his customers to cease dealing with him through threats of calling out the union men in the customer’s employ, where it appeared that such members were not the employes of the plaintiff, and their sole grievance against the plaintiff was that he had refused to discharge his employes, all of whom were non-union men and to employ in their places members of the defendant union.
In Giblan v. National Amalgamated Union, 2 K. B., 600, cited by plaintiff, it was held, that the officers of a trade union were not justified in combining to prevent a workman from obtaining any employment in his trade, by threatening his employer with a strike of the union men in the latter’s employ, where none of the acts of such officers were done on behalf of the fellow laborers of such workmen, or in the exercise of any right of theirs to withdraw themselves from an employment in which he took part, but were performed with the sole object of compelling him to pay the arrears of his defalcations as a former officer of the union.
*261 In Pickett v. Walsh, supra, the principle is declared that the right which .a labor union may exercise is limited to strikes against persons with whom the organization has a trade dispute (Syllabus 4), and that strikes are illegal where they are indulged in, not for the purpose of settling some trade dispute between the strikers and their employers, but for the purpose of coercing their employers to coerce another employer to settle a trade dispute between him and other combinations, whether of his own employes or of others.
Erdman v. Mitchell, 207 Pa., 79, is also in this same class, and in that case there was no complaint as to wages, etc., by any of the men working on the building when the strike was declared. In other words, it was not a case of grievance between employer and employed but was a ease of indirect coercion to accomplish another and more remote purpose.
It would thus seem, negatively at least, that where the alleged collective wrong, results from the collective act, done however with right, and justifiable cause, such act could not be said to have been done maliciously (Walker v. Cronin, 107 Mass., 505), and so as to render the combination unlawful, and a strike, therefore, would be lawful where the purpose was to settle a' trade dispute or some other question arising out of and incidental to the relations of the strikers themselves and their employer; that is, done with justifiable cause.
In Karges v. Local Union 131 (165 Ind., 421), there was an attempt to obtain an advance in wages, a shorter work-day, and to require the employer to furnish a scale of prices. This was held to be a lawful object. The doctrine was enunciated that employes under no contractual constraint may lawfully combine by prearrangement to quit their employment in a body for the purpose of securing from their employer an advance in wages, shorter hours or any other legitimate benefit,, even though they know, at the time that such action will be attended with injury and damage to the business of their employer, provided the strike is carried on in a lawful manner — that is, in a manner free from force and intimidation and false representation. (See note to Reynolds v. Davis, 17 L. R. A., 167.)
*262 In Jetton-Dekle Lumber Co. v. Mather, 53 Fla., 969, the court said:
“Before the courts can punish or prevent a conspiracy, either the act conspired or the manner of its doing must be unlawful. Are not both alternativess absent in the case of a simple strike ? It is certainly lawful to attempt by negotiation or other peaceable, legitimate ways to get higher pay for one’s labor, and if the attempt is not made to go elsewhere with one’s labor or to sit idle if needs be until satisfactory arrangements are made. Labor unions in and of themselves can not be said to be unlawful, and yet one of the prime objects of their existence is by combinations of the supply to regulate the demand. Some of the cases, particularly the English cases, stress the motive underlying the strike, and apparently hold that if the strike is to better the condition of the workman it is lawful, but if it be to punish the employer it is unlawful. If this be the correct delimitation, the case comes up to the rule."
See, also, State v. Stockford, 77 Conn., 227; Johnson Harvester Co. v. Meinhardt, 60 How. Pr., 169; Everett Waddy Co. v. Union, 105 Va., 188; 4 Metc., 111; 28 App. Div., 396; Allen v. Flood (1898), A. C., 1; 170 N. Y., 315; 99 App. Div., 605.
Now the evidence material to this branch of the case shows that plaintiff corporation had a preliminary working agreement with Beer .Drivers’ and Stablemen’s Local Union 175 (with which the displaced auto truck drivers were affiliated). Section 1 of said preliminary working agreement {it was not, however, a service contract) was as follows:
“Section 1. None but drivers of Driver’s and Stablemen’s Local Union No. 175 shall be employed in the -stabling departments of the parties of the second part; provided, nevertheless, that whenever party of the first part shall not- be able to supply competent men, the employer shall have the right to engage other men, and these shall, when properly certified by their respective employer, be eligible as members of Drivers’ and Stablemen’s Local Union No. 175, provided their election does not conflict with the constitution and by-laws of the Union of the United Brewery Workmen.”
Plaintiff corporation it seems had similar working agreements with the other defendant unions, all of which are substantially *263 similar (the differences apparently arising because of the difference of crafts), and Section 1 in all the agreements is identical. These agreements, as I understand, were entered into contemporaneously or practically so, and were between a combination of or rather practically all of the brewery proprietors of Cincinnati, Newport and Covington on the one hand (including plaintiff corporation) and a combination of brewery workmen of the International Union of the United Brewery Workmen of America, as represented by their various local branches or unions on the other hand. These agreements on inspection it will be found represented mutual concessions and had to do with the relations of employer and employed, and breweries operating under them were entitled to be known as union breweries.
Whether these agreements were originally devised or promoted by defendant International Union of United Brewery Workmen of America, I am unable to say from my recollection of the evidence ; but its endorsement I believe appears on the agreements. Each agreement was signed by the brewery proprietors; that is to say, by practically all the operating brewers of Cincinnati, Covington and Newport, and by the representatives of the several local unions as well. It is significant also, that all these working agreements, were by express limitation to expire simultaneously.
The evidence further shows that Mr. Klotter, president of plaintiff corporation, either arbitrarily or without sufficient reason, or possibly with justification, it is not material which, displaced the two union drivers, members of Local Union 175, and he gave to this union or its officers no opportunity, as Section 1 contemplates and requires, to furnish or supply “competent men, ’ ’ even if those displaced were not competent, a point upon which I now need express no opinion. By his persistent refusal to meet with the business agent of the union, who made every endeavor to see him, his purpose to disregard and to ignore the agreement under which all the men had been and were at work became manifest, and fully justified the officers and members of Union 175 (and Indeed the officers and men of the other unions as well) in believing that he did not intend longer to abide by the’ agreement. This belief was further justified by his final *264 refusal to meet with Mr. Stalf at the Brewers’ Exchange, notwithstanding he had expressly promised (through one of his counsel) so to do; and also by statements which had come to the ears of these men generally (through Mr. Engel, plaintiff’s former business associate) that “he (Klotter) intended to bust up the unions,” a threat, however, which it is but just to say, Mr. Klotter denies having uttered.
When the business agent of Local Union 175 found that Mr. Klotter would not meet him; a meeting of all the employes of plaintiff was called at the hall close by the brewery, as early as six o’clock in the morning, evidently at this place, in the hope that the matter could be satisfactorily adjusted and so as to enable the men to go to work. When finally it appeared that there was no purpose or desire on the part of Mr. Klotter to adjust the matter or to carry out the agreement which they claim was violated, all the employes of plaintiff affiliated with defendant unions of the International Union of the United Brewery Workmen of America at a joint meeting of their respective unions under their joint executive board, acting in concert, unanimously and voluntarily voted to walk out or to strike because plaintiff-had failed to live up to his agreement; and thereupon, or some time thereafter, I am not positive as to the precise time from my recollection of the evidence, a conference committee consisting of Messrs. Colnot, Kummer and Stalf, was appointed to take charge of the walk-out or strike.
Now under such a state of facts the employes of plaintiff affiliated with Local Union 175 certainly had legal right and ample justification for acting as they did; and I do not know of any law which would forbid them from seeking or following the advice or acting upon the direction of their union or its officers, if that is what occurred (see D., L. & W. R. R. Co. v. Union, 158 Fed., 541); and if the court is justified, asserting the inherent prerogative of equity, in looking through form to substance' and in inferring from the circumstances surrounding the execution of these several preliminary working agreements, their language and their object and purpose, that it was the general understanding of all the parties who signed these agreements that they were but parts of 'a symmetrical whole working agree *265 ment and plan, intended to govern the relations of all these local brewery proprietors and their union men in each particular brewery signatory thereto, then surely, all of plaintiff’s employes (not only those of Local 175, but those affiliated with all the other unions) had a grievance of their own with reference to their relations with their employer. For the prime importance to workingmen of working agreements of this character, especially where, as here, they contemplate giving the working man first say in the selection of competent fellow-servants, attention in passing may be directed to language of Alton B. Parker, Ch. J. (170 N. Y., 315, 324).
Under the circumstances as just detailed such strike could not be said to be, as plaintiff claims, a sympathetic strike. For definition of sympathetic strike see 1 Eddy on Combinations, Section 520.
If, then, their strike was not without justifiable cause, even though they may have known that their action would be attended with injury and damage to plaintiff’s business, their strike would still be lawful, provided it was carried on in a lawful manner, without force, violence, intimidation or false representation.
The next question would be, has there been resort to methods necessitating the interposition of equity?
After the men voted to walk out or strike, so far as plaintiff’s brewery premises, his property or his workmen who. did not go out on the strike are concerned, the men have conducted themselves according to the evidence in an orderly and peaceable manner. Some evidence was offered in an attempt to show that one Adams had some words with one Flaxmeyer, but the cause of the alleged quarrel and the circumstances are not entirely clear, and I would be unwilling to say under the evidence who it was provoked it. The private secretary testified that one evening she was jostled by a man who ran down the street, and there was also some one who testified as to having heard a threat uttered against Mr. Blotter. There was also some conflicting evidence by two laborers as to an alleged threat made against them by another laborer; but the evidence upon this also is very uncertain and conflicting. So that I may say that there is substantially nothing in the evidence, especially in view of the good *266 behavior of the men generally, at and around the premises, that would warrant this court in concluding that “threats or acts of intimidation have been made against employes who did not join the strike to compel them to quit plaintiff’s service” (petition) of such character as to warrant the interference of equity. If, however, it hereafter appears at any time, and by evidence reasonably tending to show that the men are departing or are about to depart from peaceful means or legal acts, then the court will not be slow to act.
We come now to charge (d), that defendants are engaged in intimidating plaintiff’s customers or in boycotting, by the distribution of the ‘-‘Unfair to Organized Labor” circulars (see Exhibits 1 and 2, petition).
Now the strike having been held to be lawful, it would follow that defendants had every right by peaceable persuasion to induce others (customers or prospective customers) to withhold patronage from plaintiff to aid them in their justifiable strike (Martin, Law of Labor Unions, Section 72); this, by parity of reasoning, that men have the lawful right to peacefully persuade others not to work for the one against whom they have a grievance. But this does not mean that unlawful means may be used or that a boycott may be established.
With reference to circulars such as are here involvel, there are two jurisdictions where in furtherance of a lawful strike the strikers may combine to withhold or threaten to withhold beneficial business relations from their employers’ customers to compel them to withhold their patronage from him, and circulars of the kind herein complained of, would be lawful and not subject to restraint by injunction, even though it were construed as importing a threat by the combination publishing them that its members would withhold beneficial business relations with the person so published as unfair.
Defendant relies on cases from these jurisdictions; and cites the court to Parkinson v. Building Trades Council, 154 Cal., 581; Lindsay v. Mont. Fed. of Labor, 37 Mont., 264.
But such decisions as the court intimated during argument are against the weight of authority, and it is held that if the publication is to be construed as amounting to a threat of the character *267 mentioned, it should be enjoined. Hey v. Wilson, 232 Ills., 389; Gray v. Building Trades Council, 91 Minn., 171.
What is believed to be the correct rule {Martin, Labor Unions, Secs. 83, 106a) is stated by the Supreme Court of Minnesota (91 Minn., 171) as follows:
“Whether a publication of the character under consideration would in any case amount to a threat or intimidation, must be determined from all the facts and circumstances of each pari ticular ease. Such notice might have, special significance in a particular case and have no meaning in another, and in the absence of any showing that it was intended as a threat or intimidation an injunction should not be granted.”
Or, as Martin puts it, a circular stating one is “unfair” “does not necessarily import such threat and is not unlawful, and in consequence should not be enjoined, unless it is shown to be a threat to withhold beneficial business relations from those who patronize the person with whom the combination making the publication has a trade dispute.” Martin on Labor Unions, Sec. 106a.
Applying such tests, under the evidence, there is scarcely room for doubt as to the purpose for which these circulars were designed, or to doubt, from the character of the publications in and of themselves, and the methods resorted to in distributing them and used in connection therewith, that they were threats of the kind prohibited by law and were understood as threats by plaintiff’s customers generally, and had such effect.
As soon as the circulars were placed in the customers’ hands, even in such instances where nothing more was said, there is evidence tending to show that the customer knew “what was meant.” He knew that unless he stopped dealing with plaintiff he would lose his “bread and butter”; and whereas it is evident he would not otherwise have dong so (in a number of instances), further business relations, with plaintiff were stopped by customers through fear of losing their own business. Moreover, in numerous instances (I do not undertake to quote in toiidem verbis, but'give substance only, according to recollection), the circulars were accompanied by direct threats and statements explanatory of the circulars and of their purpose.
*268 For example, Otto ITorst (saloonkeeper) tells of a visit of several of the employes, including I believe Mr. Hummer. He was told he would have to change his beer. He was told that a picket would be put at his saloon from morning to night. He complained of this unfair treatment, but he was told he had to change, and accordingly he did change his beer. (Mr. Hummer was one of the committee of three heretofore referred to.)
Circulars were placed in the saloon of Jacob Peller and he was told to sell some other beer, and that if he did not “they would boycott his place. ’ ’ They distributed the circulars in his neighborhood, to the injury of his business. Defendant Larberg, he said, threatened at the time, that if he did not put in other beer, they would make the boycott stronger, and that every union man that came in would be fined twenty-five dollars.
One Hess (saloonkeeper) knew what the circulars meant and knew it would harm him if he did not put in other beer. “I didn’t want to lose my bread and butter,” said he.
George Kennig (saloonkeeper) received circulars and was asked what he was going to do about beer. He says he was told that “a gang was to be put in front of his place.” Edward Rowell (saloonkeeper) was given circulars and told that there was to be twenty-five dollars fine for any union man caught drinking Bellevue beer. Thornton Wall said he was told his place would, be boycotted. , One James Long (saloonkeeper) was handed circulars and told that they were gotten out to boycott plaintiff’s beer; that he must quit selling plaintiff’s beer; that if he did not, the circulars would be distributed in his neighborhood. He is corroborated by one Ladinger, a gardener,- who says that one of the men told Long that if Long did not quit selling Bellevue beer they would boycott him.
Plaintiff testifies his receipts have fallen off about fifteen hundred or two thousand dollars a week. But enough of the evidence is set out for the purposes of this motion, and from the nature of which it must be apparent that the circulars themselves and the methods used in their distribution and in connection therewith, have and are having the natural’ effect of exciting the reasonable fear and apprehension of injury on the part of plaintiff’s customers, causing them to cease business re *269 lations with plaintiff, to the injury of plaintiff in his business, and hence property rights; and accordingly, I can not but conclude, under the evidence, that these circulars were designed to operate, and were and are so used as to operate, and do operate as a threat of the character forbidden by the authorities cited, and by which I am bound.
As injunction is held the proper relief against threats of the character herein indulged, a restraining order pendente lite will issue enjoining the defendants, and all of them, from further publishing and distributing, or in any way using the circulars in question, and accordingly as prayed for.