BIERING ET AL., RESPONDENTS, *v.* RINGLING, APPELLANT.

(No. 5,685.)

(Submitted June 27, 1925. Decided September 28, 1925.)

[240 Pac. 829.]

*Conspiracy—Deceit—Burden of Proof — Parties — Damages—Evidence—Sufficiency—Corporations—Minutes of Board of Directors — When not Written Evidence of Contract — Appeal — Briefs — Rules of Court — Directed Verdict — Instructions—Law of Case.*

Appeal—Briefs—Specifications of Error—Instructions — Nonobservance of Rules of Supreme Court.
   1. A specification of error based upon the giving or refusal of an instruction will not be considered where counsel fails to observe Rule X, subdivision b, of section 3, making it incumbent upon appellant to set forth the particular instruction in full.

Defective Complaint—Cured by Answer.
   2. Where a necessary allegation in the complaint is omitted but supplied by an averment in the answer, the defect will be deemed cured.

Conspiracy — Damages — Parties Owning All of Stock of Corporation Conducted as Partnership Entitled to Sue in Own Names.
   3. Plaintiffs in an action for damages resulting from a conspiracy between defendant and another to deprive them of their property, who were the sole owners of all the stock in a livestock corporation, the business of which they carried on as partners, could properly prosecute the action in their own names.

Trial—Directed Verdict—When Motion Properly Overruled.
   4. Where there is any substantial evidence in support of plaintiff's case, a motion by defendant for a directed verdict is properly overruled.

Conspiracy—Damages—Evidence—Sufficiency.
   5. Evidence in an action for conspiracy to defraud plaintiffs of their livestock business which, though incorporated, they were conducting as a partnership and who were in financial straits, in inducing them, by promises of assistance which were not kept, to agree to the formation of a new corporation of the assets of which defendant ultimately became the owner, held sufficient to justify submission of the case to the jury.

Trial—Instructions—Law of Case.
   6. Instructions given are the law of the case.

---

   1. Necessity of pleading specially noncompliance with domestic statutes by foreign corporation, see note in 9 **Ann. Cas.** 492. See, also, 12 **R. C. L.** 101.
   2. See 21 **R. C. L.** 492.

[74 Mont. 176.]

Conspiracy—Definition.
    7.   A conspiracy is a combination of two or more persons by some concerted action to accomplish a criminal or unlawful purpose or to accomplish a purpose, though in itself not criminal or unlawful, by criminal or unlawful means.

Same—Deceit—All Acts Done in Furtherance of Conspiracy Illegal.
    8.   Under section 7574, Revised Codes of 1921, acquisition of another's property by deceit is illegal, and all acts done in furtherance of a purpose to so acquire it become tainted with the illegality, although if performed without the unlawful purpose in view, they might of themselves be innocent.

Same—Damages—Proximate Cause—Burden of Proof.
    9.   In an action for conspiracy to defraud plaintiffs of their property, the burden of proving that acts of the defendant and his co-conspirator were the proximate cause of the damages sustained, and not the result of a new and independent factor for which defendant was not responsible, was upon plaintiffs.

Corporations—Minutes of Board of Directors—When not Written Evidence of Contract.
    10.   Where the minutes of the board of directors of a corporation merely recited that defendant had made a proposition for the acquisition of a block of stock and that the proposition had been accepted, but did not recite the terms of the agreement, the contention that the minutes constituted written evidence of a contract between the parties rendering inadmissible oral testimony with relation to the transaction, *held* without merit.

---

Appeal and Error, 3 **C. J.**, sec. 752, p. 845, n. 75; sec. 1589, p. 1419, n. 8; 4 **C. J.**, sec. 2229, p. 488, n. 21; sec. 2571, p. 674, n. 41.
    Conspiracy, 12 **C. J.**, sec. 1, p. 540, n. 4; sec. 8, p. 545, n. 36; sec. 99, p. 581, n. 58; sec. 224, p. 633, n. 38; sec. 234, p. 639, n. 90.
    Corporations, 14 **C. J.**, sec. 1445, p. 929, n. 46.
    Damages, 17 **C. J.**, sec. 367, p. 1065, n. 15.
    Evidence, 22 **C. J.**, sec. 1441, p. 1089, n. 23 New.
    Pleading, 31 Cyc., p. 714, n. 55.
    Trial, 38 Cyc., p. 1576, n. 35.

*Appeal from District Court, Gallatin County; B. B. Law, Judge.*

ACTION by Hans Biering and another against Richard T. Ringling. Judgment for plaintiffs and defendant appeals. Affirmed.

---

    7.   Definition and nature of conspiracy and general principles relating thereto, see note in 51 Am. Dec. 82.
    Gist of civil actions for conspiracy, see notes in **Ann. Cas.** 1914C, 763; **Ann. Cas.** 1917E, 289. See, also, 5 R. C. L. 1091.
    8.   Separate tortious acts in pursuance of conspiracy as giving rise to single cause of action, see note in **Ann. Cas.** 1915B, 1014.
    10.   See 10 R. C. L. 1024.
    12.   See 10 R. C. L. 1131.
    13.   See 15 R. C. L. 1071.

*Mr. Hubert D. Bath, Mr. James F. O'Connor* and *Mr. D. M. Kelly,* for Appellant, submitted a brief. *Mr. O'Connor* and *Mr. Kelly* argued the cause orally.

The courts hold that it is contrary to public policy to permit copartners, by virtue of agreement or otherwise, to organize a corporation for the conduct of copartnership business, hold themselves out as a corporation and then come into court and take the position that the corporation was in fact a disguised partnership. (*Seitz* v. *Michel,* 148 Minn. 80, 181 N. W. 102, 104; *Jackson* v. *Hooper,* 76 N. J. Eq. 592, 27 L. R. A. (n. s.) 658, 75 Atl. 568, 571; *Boag* v. *Thompson,* 208 App. Div. 132, 203 N. Y. Supp. 395, 398; *Conley* v. *Mathieson Alkali Works,* 190 U. S. 406, 409, 47 L. Ed. 1113, 23 Sup. Ct. Rep. 728 [see, also, Rose's U. S. Notes] ; *Peterson* v. *Chicago, R. I. & Pac. Ry. Co.,* 205 U. S. 364, 51 L. Ed. 841, 27 Sup. Ct. Rep. 513 [see, also, Rose's U. S. Notes].)

Even assuming that the sole stockholders of a corporation may maintain an action for damages for the taking of the property of the corporation by fraud or otherwise, this complaint is fatally defective, because it fails to allege that the plaintiffs were the owners of all of the stock of the Taylors Fork Cattle Company at the time the property of the Taylors Fork Cattle Company was so taken, or at all. In order to maintain such an action as this in any event, it would be necessary for the plaintiffs to allege that they owned all of this stock in this corporation at the time of the transaction of which they complain, or that the shares have devolved upon them since, not by purchase, but by operation of law. (*Dannmeyer* v. *Coleman,* 11 Fed. 97, 101, 8 Sawy. 51, 5 Morr. Min. Rep. 474.) An allegation that plaintiff was the owner of the stock at the time of the commencement of the action would not be sufficient. (*Robinson* v. *West Virginia Loan Co.,* 90 Fed. 770, 772; *Moyle* v. *Landers,* 3 Cal. Unrep. 113, 21 Pac. 1133; *South-West Natural Gas Co.* v. *Fayette Fuel Gas Co.,* 145 Pa. 13, 23 Atl. 224.)

The evidence offered and received in this case was not sufficient to support the verdict or any verdict. The complaint charges a conspiracy and overt acts committed in pursuance thereof, out of which it is alleged the damages arose. While there are cases to the contrary in other jurisdictions, the rule is well settled in Montana that where a conspiracy is entered into by any number of persons, great or small, for the purpose of injuring another or another's business or another's property, no cause of action can arise on account of any overt acts in furtherance of such conspiracy, unless such acts be illegal or, being legal, that they be carried out in an unlawful manner. (*Lindsay & Co.* v. *Montana F. of L.*, 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707, 96 Pac. 127; *Empire Theatre Co.* v. *Cloke*, 53 Mont. 183, L. R. A. 1917E, 383, 163 Pac. 107.) There is no evidence in this record that the defendant, or anyone connected with him, committed an illegal act in furtherance of this alleged conspiracy, or that he did any act in an unlawful manner. (See 12 C. J., sec. 104; *Dalury* v. *Rezinas*, 183 App. Div. 456, 170 N. Y. Supp. 1045, 1049; affirmed, 229 N. Y. 513, 129 N. E. 896; *Almirall & Co., Inc.,* v. *McClement*, 207 App. Div. 320, 202 N. Y. Supp. 139, 148; *Kelly* v. *Chicago, M. & St. P. Ry. Co.*, 93 Iowa, 436, 61 N. W. 957, 962; *Bitzer* v. *Washburn*, 121 Iowa, 462, 96 N. W. 978; *Conner* v. *Bryce*, 170 N. Y. Supp. 94; *Bowman* v. *Wohlke*, 166 Cal. 121, Ann. Cas. 1915B, 1011, 135 Pac. 37, 39; *O'Callaghan* v. *Cronan*, 121 Mass. 114.)

The minutes of the meetings of the Taylors Fork Cattle Company and Southern Montana Livestock Company constituted a written contract between plaintiffs and the defendant and superseded all the oral negotiations or stipulations concerning its matter which preceded or accompanied it. (*Schlens* v. *Poe*, 128 Md. 352, 97 Atl. 649; *Western Timber Co.* v. *Kalama River Co.*, 42 Wash. 620, 114 Am. St. Rep. 137, 7 Ann. Cas. 667, 6 L. R. A. (n. s.) 260, 85 Pac. 338; *Salusbury* v. *American Vulcanized Fibre Co.*, 5 Boyce (Del.), 182, 91 Atl. 536; *Foreman's Systems* v. *Milk Dealers' Crate Co.*, 13

Del. Ch. 351, 120 Atl. 358.)   It therefore follows that the obligations of the defendant Ringling must be determined by an examination of these written instruments.

*Mr. C. E. Carlson, Mr. W. S. Hartman* and *Messrs. Haight, Adcock, Haight & Harris,* for Respondent, submitted a brief; *Mr. Carlson* and *Mr. Hartman* argued the cause orally.

It is evident from the decisions in *Barnes* v. *Smith,* 48 Mont. 309, 137 Pac. 541, *Hanson Sheep Co.* v. *The Bank,* 53 Mont. 324, 163 Pac. 1151, and *Scott* v. *Prescott,* 69 Mont. 540, 223 Pac. 490, that in none of them is there any statement or insinuation that it was contrary to public policy for the owners of all the stock of a corporation, whether one or more persons, to conduct their own business in the name of the corporation, and to use it as a convenience or agency for the conduct of such business.   All that the court says in any of the cases is that such conduct of a corporation must not be used or relied upon to defraud anyone dealing with it, or with the individual stockholders.   In other words, this court will not permit corporations, individuals or copartnerships to take advantage of or defraud anyone, either by doing business in the name of a corporation or by relying upon that fact when an injured person with whom they have been dealing seeks redress in the courts, but there is nothing in the conduct of business in such fashion which is contrary to public policy. There was no fraud or deceit practiced by Biering and Cunningham. They did not use Taylors Fork Cattle Company to deceive or defraud anyone.   They entered into a personal agreement with the appellant to procure the conveyance to the new corporation to be organized by plaintiffs and defendants, of all of their property and business held in the name of Taylors Fork Cattle Company, and they complied absolutely and to the letter and in the spirit with their agreement.   In the case at bar, it was not only permissible but necessary that the suit be brought by Biering and Cunningham.

The evidence is amply sufficient to support the verdict, bearing in mind the principles which guide a court when dealing with fraud announced in *Merchants' Nat. Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250, 851.

The minutes of corporate meetings do not of themselves constitute contracts. Appellant has cited many cases on the proposition that minutes of a corporate meeting constitute a contract. There is no question that there are many instances where such minutes do constitute the evidence of a contract, but it will be noted that those cases are where the minutes of a meeting are held to constitute a contract between the corporation and some other party, and often it has been held that the corporation cannot deny its own minutes when some other person has relied on them to his own risk. These rules of law, however, are far from the situation in the case at bar. Attempt is made to relieve defendant of liability on the ground that the only contract between the parties is one that is evidenced by the minutes of the meeting, and that defendant did not violate this alleged contract. This is not an action on contract, and so far as this case is concerned, it would make no difference whether the minutes of the meeting did or did not constitute a valid contract.

Whether the minutes of a meeting constitute a contract depends upon whether the parties intended those minutes to embody the terms of their contract. This is fundamental. (See Wigmore, secs. 2401, 2409 and 2430 ; also see *Brockway* v. *Blair*, 53 Mont. 531, 165 Pac. 455.) In *Hygienic Health Food Co.* v. *Grant*, 187 Cal. 431, 202 Pac. 653, it was held that the minutes of a meeting of a board of directors could be contradicted by other evidence. In *Cannon* v. *Grain Agency*, 103 Or. 26, 202 Pac. 725, the court quotes from Fletcher's Cyc. of Corporations, to the effect that when the minutes contain a record of the action taken, it will be presumed *prima facie* that the record covers the entire action. This is not conclusive, however, and parol evidence may be introduced to show

what in fact was done.   (See, also, *Goodwin* v. *Insurance Co.,* 24 Conn. 591, 601.)

An action lies wherever a plaintiff is aggrieved and damnified by unlawful acts done by defendant pursuant to a plan and conspiracy for that purpose. (*Hammond* v. *Sully,* 48 App. D. C. 320, 4 A. L. R. 160; *Mott* v. *Danforth,* 6 Watts (Pa.), 304, 31 Am. Dec. 468; *Rumney* v. *Skinner,* 64 Mont. 75, 208 Pac. 895; *McIntyre* v. *Dawes,* 71 Mont. 367, 229 Pac. 846; 26 R. C. L. 756.)

Whether damages proximately flowed from the wrongful acts of the conspirators is a question for the jury. (*Doremus* v. *Hennessey,* 176 Ill. 608, 68 Am. St. Rep. 203, 43 L. R. A. 797, 52 N. E. 924, 54 N. E. 524; 5 R. C. L. 1104.)

MR. JUSTICE STARK delivered the opinion of the court.

This is an action in tort, wherein the plaintiffs seek to recover from the defendant damages alleged to have been sustained by them as the result of a conspiracy entered into between the defendant and another for the purpose of depriving them of their property and gaining possession and control thereof for himself.

In the complaint it is alleged that in the year 1921 the Taylors Fork Cattle Company, a Montana corporation, which will be hereafter referred to as the Taylors Fork Company, was the owner and in possession of a large amount of real estate, leases of real estate, and grazing permits for the running of sheep on the Gallatin and Madison National Forests, all having a capacity for the pasturage and grazing of 27,000 head of sheep, and in addition thereto owned a large amount of personal property, but was not possessed of sufficient live-stock to stock the same so as to produce revenue therefrom, all of which properties had a value, above indebtedness on the same, of more than $500,000.

The capital stock of this corporation consisted of 500 shares, 496 of which were owned by plaintiffs, who for more than twenty years had been partners in the livestock business, and

the other four shares were held by persons other than plaintiffs for the purpose of making up the board of directors. This corporation was used by plaintiffs merely as a convenient agency for carrying on their partnership business, and all of the property standing in the name of the corporation was in truth and fact the property of plaintiffs as partners.

It is alleged that the defendant, knowing the condition of plaintiffs' ownership of the capital stock of said corporation, their ownership of said properties, and the value thereof, entered into a conspiracy with one Lester P. Work, with whom he had been associated in business for many years as partner or otherwise, to defraud the plaintiffs of their property and gain possession and control thereof for himself.

In brief, the scheme of the defendant and his co-conspirator, Work, as stated in the complaint, was to induce the plaintiffs to join with him in the organization of a corporation to engage in the ranching and livestock business, with a capital stock of $500,000, upon the understanding and agreement that plaintiffs would cause the Taylors Fork Company to transfer to it all of its properties, of which plaintiffs as partners were in fact the owners, in consideration of one-half its capital stock, and that the defendant, for the remaining half of said capital stock, should turn over to the corporation 12,000 head of good, young, merchantable ewes, and then finance the corporation to the extent that it would be able to stock its properties to their full capacity of 27,000 head of sheep, and, after having effected the organization of such corporation and having secured the transfer of the plaintiffs' properties to it, to finance the corporation in such a way as to freeze the plaintiffs out and secure their stock.

The complaint says that this new corporation was organized under the name of the Southern Montana Live Stock Company (which will be hereafter referred to as the Southern Montana Company); that, relying upon the defendant's promises and agreements, and believing that he would keep and perform the same, plaintiffs caused their properties to be trans-

ferred and conveyed to it by the Taylors Fork Company, and received therefor one-half of its capital stock, less seven shares, which were issued to other persons for organization purposes; that defendant transferred a band of between 11,000 and 12,000 sheep to it, and received capital stock of the Southern Montana Company equal to that received by the plaintiffs.

It is then alleged that all of the agreements and promises made by the defendant were made as inducements to the plaintiffs to part with their property, and were so made by him fraudulently, deceitfully and without any intent on his part to keep and perform the same, and as a part of the general scheme arranged between him and Work to defraud the plaintiffs of their property. It is said that the defendant wholly failed to keep his agreement to finance the corporation to the extent of the capacity of its properties for running 27,000 head of sheep, and many acts of fraud, mismanagement, oppression and deceit on the part of the defendant and his co-conspirator are then set forth. It is claimed that by reason of them, and without fault on the part of plaintiffs, after about two years' operation of the corporation, its stock had become valueless; all that originally was owned by plaintiffs had been acquired by the defendant without consideration to them, and thereby the defendant and his co-conspirator had accomplished their purpose.

The formal allegations of the complaint were admitted by the defendant's answer, but issue was joined upon all the allegations of conspiracy and fraud.

The cause was tried to a jury. At the close of the plaintiffs' testimony, defendant made a motion for a directed verdict in his favor, which was denied, and he thereupon rested his case without the introduction of any evidence. The jury returned a verdict in favor of plaintiffs, upon which a judgment was entered. Defendant moved for a new trial, which was denied, and he has appealed from the judgment.

In the beginning we are confronted with a contention on the part of respondents that the bill of exceptions embraced in the record cannot properly be considered by the court on account of irregularities and defects in its preparation and settlement. This bill is a proper subject of adverse criticism. As it appears in the transcript on appeal, it takes up nearly 1,300 printed pages, many hundreds of which could readily have been eliminated by any proper effort at abbreviation, and the task of reviewing it thereby greatly lightened; but we cannot disregard the bill on this account.

An inspection of the record discloses that the judgment was entered on July 14, 1924, and motion for new trial made in due time, which was denied on September 5, 1924; that on August 6 an order was made by the court granting defendant sixty days in addition to the statutory time in which to prepare and serve his bill of exceptions on appeal to the supreme court. Under the statute the defendant was entitled to fifteen days after September 5 in which to prepare and serve his proposed bill of exceptions, and the sixty days additional granted by the court on August 6 carried this time beyond November 8, the date upon which the proposed bill was actually served and delivered to the clerk for the judge. Under these conditions we are obliged to hold that the objections to the consideration of the bill of exceptions must be overruled.

Counsel for defendant have made twelve specifications of error in their brief, the first three of which raise but two questions for consideration, namely: (1) Whether the complaint states facts sufficient to constitute a cause of action; and (2) whether there was sufficient evidence to justify the court in submitting the case to the jury.

The remaining specifications of error, 4 to 12, inclusive, [1] relate to instructions given by the court. Since these specifications wholly ignore the requirements of subdivision (b), section 3, of Rule X of this court, and counsel for defendant made no effort to correct the defect after their attention was called to it in plaintiffs' brief, they will not be con-

sidered. (*Brockway* v. *Blair*, 53 Mont. 531, 165 Pac. 455; *Cornner* v. *Hamilton*, 62 Mont. 239, 204 Pac. 489.)

In support of their contention that the complaint does not state facts sufficient to constitute a cause of action in favor of the plaintiffs, defendant in the first place presents the argument that it was contrary to public policy for the plaintiffs to carry on their partnership business in the name of the Taylors Fork Company. This contention need not be considered. The method in which the Taylors Fork Company carried on its business prior to the time of the transactions between the plaintiffs and the defendant is not the subject of inquiry here.

The complaint alleges that the plaintiffs, as partners, entered into an agreement with the defendant to procure the conveyance to the Southern Montana Company of all of their property and business, held in the name of the Taylors Fork Company, and that they complied with their agreement in that behalf. No question of public policy is involved.

It is next contended that the damages, if any, sustained by plaintiffs, could only be recovered in an action brought in the name of the Taylors Fork Company. Before entering upon a consideration of this contention, it is proper to consider the allegations of the pleadings in reference to the ownership of the shares of capital stock of the Taylors Fork Company, concerning which there is a considerable amount of discussion in the briefs.

In the complaint it is alleged that the plaintiffs owned 496 of the 500 shares of this stock, and that the other four shares were held by persons other than the plaintiffs for the purpose of making up the number of directors required by law; but it is not expressly alleged that the plaintiffs were in reality the owners of these four shares, although an inference to that effect might be drawn from the complaint as a whole.

In the first section of his answer the defendant says that he has not sufficient knowledge or information to form a belief as to these allegations of the complaint, and therefore denies the same. However the answer contains two other sections:

(1) A further defense, and (2) a further defense and counter-claim, in each of which it is alleged that "the plaintiffs were operating and the owners of all the capital stock of what was known as the Taylors Fork Company, a corporation," *etc.,* which allegations are admitted in the plaintiffs' reply. If an [2] allegation that the plaintiffs were in fact the owners of all the capital stock of the Taylors Fork Company was necessary, the defect in the complaint in this respect was cured by the allegation of that fact in the answer. (*Stephens* v. *Conley,* 48 Mont. 352, Ann. Cas. 1915D, 958, 138 Pac. 189; *Anderson* v. *Wirkman,* 67 Mont. 176, 215 Pac. 224.)

In this situation it must be considered that the complaint [3] contains sufficient allegations to the effect that the plaintiffs in fact were the owners of all the capital stock of the Taylors Fork Company, and likewise as partners, were the real owners of all the property standing in the name of that corporation. This brings the case within the principle adopted in the case of *Camp* v. *Gress,* 244 Fed. 121, 156 C. C. A. 549, affirmed in 250 U. S. 308, 63 L. Ed. 997, 39 Sup. Ct. Rep. 478.

The plaintiffs had a right to bring this action in their own names, and the complaint states a cause of action in their favor.

This leaves for consideration only the question whether there was sufficient evidence to justify the court in submitting the case to the jury. This presents three inquiries: (a) Does the evidence tend to establish that the defendant entered into a conspiracy with Work to defraud the plaintiff as alleged in the complaint? And, if so, (b) Did the plaintiffs produce evidence from which a jury would be entitled to draw a conclusion that the defendant, in furtherance of such plan and scheme, committed overt acts which resulted in damage to the plaintiffs? And, finally, (c) Was there evidence from which the jury could properly estimate the amount of this damage?

In pursuing these inquiries, we must bear in mind that there is no dispute in the testimony, and also the rule, many times announced by this court, that, where there is any substantial

[4] evidence to support the plaintiffs' case, it is proper to refuse defendant's motion for a directed verdict. (*In re Carroll's Estate,* 59 Mont. 403, 196 Pac. 996.)

That Work and Ringling formulated a scheme to deprive [5] the plaintiffs of their property does not admit of doubt. A witness, A. M. Sackett, testified that during the fall or early winter of the year 1920, at the Birch Creek ranch in Meagher county, he overheard a conversation between these two men in which they were discussing the condition of certain sheep owned by them, which were located on the ranches of the Taylors Fork Company. In response to an inquiry made of him by Ringling, Work said: "They are all right. There is plenty of feed and pasture over there, and we will just leave them there. They are old, and we do not ever have to move them anyway. As I have said to you before, that is one of the best sheep ranches in the state. We want to get hold of that. With that summer range and pasture it will make our outfit complete. You know Cunningham and Biering are crazy to get into the sheep game, and they don't know anything about sheep. I think that we can get them into a corporation, stock it up with those old sheep and finance it in such a way that we can freeze them out." To this suggestion Ringling replied: "You can arrange a meeting; I will form the corporation." It is significant that there was no cross-examination of this witness, and that neither Work nor Ringling went upon the witness-stand to deny the statements attributed to them; so that these statements stand unimpeached and undenied.

It is admitted in the pleadings that the Southern Montana Company was organized for the purpose of taking over the plaintiffs' properties from the Taylors Fork Company and 12,000 head of sheep from the defendant, and that, in consideration therefor, all the capital stock of the company was to be equally divided between the plaintiffs and the defendant; that the Taylors Fork Company did convey said properties to the new corporation; that the defendant conveyed to it about

12,000 head of sheep; that the capital stock was divided as had been agreed upon; and that plaintiff Biering was made president and general manager of the company.

Since the record in the case is so voluminous, manifestly it would unnecessarily prolong this opinion to undertake a statement of all of it, but some of the salient points in the testimony, tending to establish the overt acts committed by the defendant and his co-conspirator in furtherance of the object of the conspiracy, are as follows:

In financing the company, instead of loaning money to it or providing some method of procuring cash to be placed in the treasury for expenditure by the officers in stocking the company's properties, the defendant adopted the plan of furnishing sheep direct to plaintiffs from bands owned by him and his co-conspirator, Work, and taking notes therefor. From the original band of 11,000 or 12,000 ewes, turned over to the Southern Montana Company by the defendant, there were produced in the year 1921 about 8,500 lambs, of which 1,500 were sold to the defendant and Work upon an express agreement that they would furnish the company with 10,000 head of good ewe lambs in the spring of 1922.

Meantime, during the summer of 1921, Ringling and Work brought on to the Southern Montana Company's properties about 10,000 head of their own sheep, where they were pastured and fed, the expense of keeping them being paid by the Southern Montana Company, which was never fully compensated therefor. In October, after Ringling and Work had taken the wool and lamb crop for the season, Work attempted to sell the whole 10,000 to the company, but, upon Biering's objection to the quality of these sheep, Work picked out 4,000 of the poorest ones, turned over 6,000 to the company, taking notes in the sum of $65,000 as payment for 10,000 head, promising that he would later deliver 4,000 good, young ewes to make up the general average of the 10,000 band. A little later Work delivered 4,000 head from the Ringling and Work ranch at White Sulphur Springs, but they were not seen by

Biering until after delivery, when he found that they were old, poor and so bad that Work apologized and promised that it would be made all right when the 10,000 young ewes were delivered in the spring of 1922.

In the spring of 1922 Biering went to the Ringling and Work ranch at White Sulphur Springs to obtain the 10,000 ewes which had been promised at the time of the sale of the 1,500 lambs and the delivery of the 4,000 head above mentioned, but upon his arrival at the ranch Work notified him that he could have only 3,000 sheep, although Ringling and Work then had upwards of 19,000 available at that place. As the Southern Montana Company was short of sheep and not financially able to get them elsewhere, Biering finally acquiesced in Work's declaration that he was to have only 3,000 head. After a considerable amount of discussion and the inspection of various bands of sheep, Biering agreed to accept 3,000 black-faced sheep out of a band shown to him by Work, and, as it was necessary for him to leave in order to make arrangements to have the sheep driven across the forest reserve, he said to Work that he would leave it to him as an officer and director of the Southern Montana Company to see to it that the sheep selected were the ones that were delivered; but when the sheep arrived at the company's ranch they were short about 200 head, and consisted of a mixed lot of black faces, white faces, coarse wool and about 150 wethers. There was no evidence of any attempt to further comply with the agreement to furnish 10,000 head of good ewes in the spring of 1922.

The Southern Montana Company went into the summer of 1922 with about 19,000 head of sheep instead of 27,000 head, due to the failure and neglect of Ringling properly to assist in financing it. The lamb crop for 1922 was sold to John Clay & Co. of Chicago in the fall and brought a total of a little over $130,000, and, although Ringling and Work were directors of the company, without authority for doing so, they

held out something over $10,000 of this amount, claiming it as commissions on this sale, and also demanded that the whole sum should be turned over to John Clay & Co., to be applied to the account of Ringling & Work. When this demand was refused by Biering, as manager of the Southern Montana Company, John Clay & Co. deducted from the total sale price of these lambs the sum of $114,319.80 as payment for notes due from the Southern Montana Company, including some notes which Ringling and Work had received from the company and turned over to John Clay & Co., leaving a balance still due of $5,625.79, and this balance Ringling and Work took for their own use; so that the Southern Montana Company received no funds whatever from the 1922 lamb crop. The settlement of this transaction was in November, 1922. Thereafter the Southern Montana Company received no further credit from that source, and was left without adequate funds for operations during the ensuing months.

It had been the custom that the ordinary running expenses of the Southern Montana Company should be paid by drafts drawn by those in charge of the ranch operations, but during the month of January, 1923, Work instructed Ringling's private secretary to see to it that no checks drawn by the plaintiffs were paid, stating that they had cut off their credit. Following these instructions, payment was refused on numerous drafts drawn in payment of hay, pasturage, labor, groceries and other supplies necessary for the conduct of the business. After payment had been refused on these drafts, the plaintiff Biering went to the Metals Bank of Butte, where the Southern Montana Company had theretofore borrowed $90,000, seeking further financial assistance, which was refused, and he was advised that his credit was no good. There was testimony to the effect that between the time of the organization of the Southern Montana Company in 1921, and the fall and winter of 1922, the price of lambs and wool just about doubled, that in 1923 the market was a little stronger than

in 1922, and that, if the company's ranches had been stocked to their capacity, it would have made money.

When the plaintiffs received their stock in the Southern Montana Company, they turned it over to the Elling Estates Company as collateral to some notes which they, with others, were owing to that institution. Shortly thereafter, Work induced one Malott, manager of the Spokane & Eastern Bank, to demand from the Elling Estates Company the plaintiffs' notes and stock as additional security for an indebtedness due from the plaintiffs and the Elling Estates Company to that bank, for the purpose of enabling the Spokane and Eastern Bank to foreclose on the stock, so that Ringling and Work could get hold of it. In the fall of 1922 the Spokane & Eastern Bank, being induced to do so by Work, commenced an action against the plaintiffs and other signers of said notes and sought to foreclose their lien on the plaintiffs' stock ahead of other collateral which it held. When Work's attention was called to this situation, he admitted he was responsible for it, and was pleased that he had been able to "put it over" on the plaintiffs. When Ringling was advised of these facts, he admitted that he knew all about it.

In December, 1922, just about a month after the settlement with John Clay & Co., and while the Spokane & Eastern Bank suit was pending against them, the plaintiffs had a conference with Ringling in Butte with reference to the affairs of the Southern Montana Company and their own affairs, in which the above-mentioned Spokane & Eastern Bank transaction was discussed, as well as the financial situation of the Southern Montana Company; whereupon Ringling agreed that the Southern Montana Company should sever its relations with Ringling & Work, and that a bond issue should be floated to enable the Southern Montana Company to pay its indebtedness and do business on a cash basis by purchasing sheep in the open market and doing away with the difficulties between it and Ringling and Work. At this time Ringling requested

Biering to resign as president of the Southern Montana Company and allow himself (Ringling) to be elected to that office, so as to make the financing of the company easier. At the same time the plaintiffs advised Ringling confidentially that they were obliged to depend entirely upon the Southern Montana Company for all of their income, and that they had no other resources. In furtherance of the agreement then made, Biering did resign as president of the company, and on December 30, 1922, Ringling was elected to that office, but no steps were ever taken toward a bond issue. At this Butte conference, Ringling promised plaintiffs to protect them against the loss of their stock on account of the action of the Spokane & Eastern Bank; but it is further shown that this stock, together with plaintiffs' notes, got back into the possession of the Elling Estates Company, and that the defendant subsequently became the owner of them.

At the time of the organization of the Southern Montana Company, Ringling had agreed with the plaintiffs that Work should have nothing to do with the management of its affairs on account of the fact that Work was in disrepute with the federal officers having charge of the national forests, and the further fact that he had made a failure of any business which he had theretofore been engaged in. In January, 1923, Biering had a talk with Work in which Work was directed to refrain from interfering with the business of the Southern Montana Company, whereupon Work informed Biering that he "was going to have it all in a little while, and that he was going to break Biering up in business." About an hour later Work handed Biering a telegram from Ringling, instructing him (Work) to take care of the Southern Montana Company, and stating that he (Ringling) did not care to finance the company further unless "we have complete control"; and it appears that, just prior to that time, on December 28, 1922, Ringling had executed to Work a proxy authorizing him to vote all of the Ringling stock at all stock-

holders' meetings. At this time the company was in serious financial straits; Ringling was in Florida; Biering sent him six telegrams, which were not delivered, for the reason that Ringling refused to receive them.

There was evidence in the case from which the jury were justified in concluding that the directors of the Southern Montana Company were dominated and controlled by Ringling and Work; that valuable leases were lost to the Southern Montana Company through its inability and. neglect to pay the rentals due thereon; that all the sheep belonging to the company were sold at less than their market value; that director Work took funds of the company under, the guise of commissions, without legal authority for doing so; that the plaintiffs were harassed by numerous lawsuits instituted by the conspirators; their credit ruined so that they were unable to raise funds with which to pay their indebtedness and redeem their stock; and that finally it passed into the ownership of Ringling by purchase from the Ellings Estates Company, so that, at the end of about two years of operations of the Southern Montana Company,· the plaintiffs had lost all their property valued at half a million dollars, and the defendant had acquired it all, without any compensation accruing to plaintiffs, so far as this record discloses. It also appeared in the evidence that at all times during these operations the defendant was possessed of ample resources so that he could easily have assisted in financing the company, had he so desired, and so have avoided the catastrophe which overtook it.

On the question of damages, the court in its instruction No. 8 advised the jury: "In fixing the amount of actual damages, you may take into consideration the value of the property transferred to the Southern Montana Live Stock Company, at the date that the plaintiffs parted with the same, and you should deduct from such value the amount of indebtedness which you may find from a preponderance of the evidence was against the property at the time. In no case

can you fix the actual damages at a greater sum than the difference between the value of said property so found by you and the said indebtedness." The only objection offered to this instruction by the defendant was as follows: "The defendant objects to the giving of instruction No. 8, offered by the plaintiffs, for the reason that it does not state the correct measure of damages which may be used by the jury in the determination of the damages suffered by the plaintiffs, if any, in this case, in that it permits the plaintiffs to recover the value of the property which was turned over to the Southern Montana Live Stock Company, without regard to the indebtedness of the Taylors Fork Cattle Company, a corporation, as it existed at the time of the transfer; and that there is no basis upon which the jury may determine any damages in this action."

This instruction became the law of the case. (*Bliss* v.
[6] *Wolcott,* 40 Mont. 491, 135 Am. St. Rep. 636, 107 Pac. 423.) A bare reading of the instruction shows that the first portion of the objection was groundless; and a consideration of the testimony discloses that the last portion was without merit.

While there is considerable discussion in the briefs of counsel as to the value of the properties belonging to the plaintiffs, and which were turned over to the Southern Montana Company, that matter is not in dispute on this record. Numerous witnesses testified that it was worth in excess of $646,000. The indebtedness against it was placed at $146,000, leaving its net value, above any encumbrances, at $500,000. In addition to this, it was testified to by the plaintiff Biering that, at the time the transfer was made, it was agreed between the plaintiffs and the defendant that the value of their property was $500,000, exclusive of their debts, and there was no contradiction of this testimony.

When the Taylors Fork Company transferred plaintiffs' property to the Southern Montana Company, the plaintiffs

lost their interest in one-half of it, and the defendant acquired that half; and when the defendant came into the ownership of the plaintiffs' stock in the Southern Montana Company through his purchase from the Elling Estates Company, he acquired the other half of the plaintiffs' property and thereby consummated the scheme which he and his co-conspirator, Work, had formulated in their talk at the Birch Creek ranch in the fall or early winter of the year 1920, if the testimony of the witnesses given at the trial was true.

"A conspiracy is a combination of two or more persons [7] by some concerted action to accomplish a criminal or unlawful purpose or to accomplish a purpose, not in itself criminal or unlawful, by criminal or unlawful means." (*Lindsay & Co.* v. *Montana F. of L.,* 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707, 96 Pac. 127.)

"That is not lawful which is: (1) Contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or, (3) otherwise contrary to good morals. (Sec. 7553, Rev. Codes 1921.)

"A promise, made without any intention of performing it" is a deceit. (Sec. 7575, *Id.*)

"One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Sec. 7574, *Id.*)

No man can justify the acquisition of another's property by deceit. To undertake such an acquisition is an illegal act within the purview of the Code sections above quoted. "It is the illegality of the purpose to be accomplished, or the illegal means used in furtherance of the purpose, which makes the act illegal." (*Lindsay & Co.* v. *Montana F. of L., supra,* at page 273, 37 Mont.)

If the purpose sought to be accomplished is illegal, then all [8] the acts done in furtherance of that purpose become tainted with the illegality, although, if performed by them-

selves without the unlawful purpose in view, they might be innocent.

It was, of course, incumbent upon the plaintiffs in order [9] to be entitled to recover, to prove that the acts of defendant and his co-conspirator were the proximate cause of the damages sustained by them. In *Doremus* v. *Hennessy,* 176 Ill. 608, 68 Am. St. Rep. 203, 43 L. R. A. 797, 802, 52 N. E. 924, 54 N. E. 524, it is said: "Whether the injury and damage sustained by plaintiff resulted from the acts of the defendant or were the result of a new, independent factor for which appellants were not responsible, cannot be determined by the court as a question of law, unless the fact be conceded or the proof be substantially all to that effect."

It cannot be said as a matter of law that the testimony of the witnesses given at the trial was not true, and the case was properly submitted to the jury. By their verdict the jury resolved the issues of fact in favor of the plaintiffs. The amount of their verdict is well within what they were authorized to award under the instructions of the court, and this verdict cannot be disturbed.

We have given due consideration to all the matters discussed by counsel in their briefs but have found nothing therein which would justify a conclusion other than that above stated.

The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES HOLLOWAY, GALEN and MATTHEWS concur.

MR. CHIEF JUSTICE CALLAWAY, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.

ON MOTION FOR REHEARING.

MR. JUSTICE STARK delivered the opinion of the court.

Counsel for defendant filed a petition for a rehearing in this case upon various grounds, among them being that the court overlooked a material and vital question relative to the sufficiency of plaintiffs' evidence to sustain the judgment, for the reason that, in the opinion filed, no mention was made of the effect of certain minutes of the proceedings had at meetings of the boards of directors of the Taylors Fork Company and the Southern Montana Company.

It did not appear to us that a consideration of the effect of these minutes was material to a decision of the case as presented in the record. Counsel, however, urge their views in this matter with such insistence that we add to what is said in the original opinion the following observations relative to the sufficiency of the evidence to sustain the judgment:

Without objection, each of the plaintiffs testified that the [10] agreement between themselves and the defendant, by which they were induced to join with him in organizing the Southern Montana Company for the purposes and upon the terms and conditions recited in the complaint, was made by oral negotiations carried on between them some time in the spring of 1921. Upon cross-examination of the plaintiff Biering, it was shown that subsequent to the time when this agreement was made, and on May 19, 1921, the plaintiffs caused a meeting of the board of directors of the Taylors Fork Company to be held, at which a resolution was adopted containing a recital to the effect that the defendant had made a proposition to the company that he would transfer certain sheep to the Southern Montana Company and assist in financing its operations, upon condition that the Taylors Fork Company would transfer to said corporation all of its property, consisting of real estate, land contracts and leases,

with the equipment appurtenant thereto, and that, as a consideration therefor, the defendant should receive one-half of the stock of said corporation, less seven shares, to be issued to other persons to qualify them as directors, and that the Taylors Fork Company, or Biering and Cunningham, as its principal stockholders, should receive a like amount of the stock of said corporation.

In connection with the cross-examination of the same witness, over objections of the plaintiffs, there was also introduced in evidence the minutes of a meeting of the board of directors of the Southern Montana Company, held on May 27, 1921, in which it was disclosed that the defendant and the plaintiffs were both present, and at which the defendant made a proposal to the company that he would turn over to it 12,000 head of ewes and approximately 250 head of bucks and all livestock and property used in connection with the handling of the same, free and clear of all encumbrances, and would agree to assist the company in financing itself and disposing of its commercial paper in consideration of 2,493 shares of its capital stock. The minutes also showed that at this meeting the plaintiff Cunningham stated to the directors that, as a stockholder and director of the Taylors Fork Company, he was authorized to announce that said company would transfer to the Southern Montana Company all of its real estate and additionally some personal property, in consideration of 2,493 shares of its capital stock. The minutes show that both of the above propositions were accepted.

Counsel urge that the recitals contained in the minutes of these two meetings constitute written evidence of the contract between the plaintiffs and the defendant; that any oral arrangements which may have theretofore been made between them must be deemed merged in the written contract thus disclosed; that, since these minutes refer only to the fact that the defendant was to turn over to the Southern Montana Company 12,000 head of ewes and 250 bucks and

assist in financing it, but do not contain any recitals that he was to finance or assist in financing this company, so as to enable it to stock its ranches to their capacity of 27,000 head of sheep, the rights of the parties. to this action must be determined solely by the recitals contained in these minutes; that it was not competent, to vary these recitals by oral testimony; that the evidence wholly failed to establish that defendant had not done everything he agreed to do, according to the recitals contained in these minutes, and hence the plaintiffs had not sustained the burden of proving their case.

There is no merit in this contention. It is manifest that the resolution shown by the minutes of the meeting of the board of directors of the Taylors Fork Company was adopted only as a part of the means of carrying into effect the contract which had theretofore been entered into between the plaintiffs and the defendant, and that it was not intended that it should state what that contract was, and it did not, in fact, purport to do so.

So far as the minutes of the Southern Montana Company are concerned, they do not in any manner pretend to state the terms of any agreement between the parties to this action. Nothing contained in them even remotely intimates the existence of such an agreement. According to their recitals, the defendant made a proposition to this company which was accepted. The Taylors Fork Company likewise made a proposition to the company which was accepted. That is all these minutes assume to state. They do not purport to state the terms of any agreement made between the plaintiffs and the defendant individually at the time this meeting was held, or at any other time.

Therefore a consideration of the circumstances under which the recorded minutes of a corporate meeting are deemed to have the effect of a contract was not essential to a determination of the case on this appeal.

The other grounds advanced in support of the petition for a rehearing amount only to a reargument of the appeal on its merits, and we are satisfied with the original disposition of them.

The motion for a rehearing is denied.

*Rehearing denied.*

ASSOCIATE JUSTICES HOLLOWAY, GALEN and MATTHEWS concur.

MR. CHIEF JUSTICE CALLAWAY, having been absent on account of illness when the cause was originally heard and submitted, did not take part in the former decision and takes no part in this.